# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

**DARRIN SHATNER**,

**Plaintiff,**

**v.**

**THOMAS PAGE, ROGER COWAN**
**IAN OLIVER, ALAN FRENTZEL,**
**WILLIAM PIERCE, DARREL WESTERMAN,**
**DAVID DOBBS, DENNIS STEWART,**
**KEITH BENEFIELD, LAMONT GILBERT,**
**and ROBERT GALES,**

**Defendants.**                                          **No. 00-0251-DRH**

## MEMORANDUM and ORDER

**HERNDON, Chief Judge:**

### I.  Introduction and Procedural Background

On April 3, 2000, Darrin Shatner, an inmate formerly housed in the condemned unit at the Menard Correctional Center, *pro se*, filed suit against Donald Snyder, Warden Thomas Page, Warden Roger Cowan, Warden Ian Oliver, Warden MacAdory, Supt. Frentzel, Supt. Terry, Capt. Young, Capt. Pierce, Lt. Westerman, Lt. Gilbert, Lt. Taylor, Capt. Harvey, C/O Dobbs, C/O Dixon, Lt. Gales, C/O Benefield, C/o Stewart, Deputy Director Clark and "two John Does" pursuant to **42 U.S.C. § 1983** (Doc. 1).  Thereafter, on November 13, 2002, pursuant to **28 U.S.C. § 1915A**, the Court conducted a threshold review of Shatner's Amended Complaint and designated it into 7 separate counts (Doc. 10).  The Court dismissed Counts 1, 3, 4

and 7 for failure to state a claim and Defendants Captain Young, Lt. Gilbert, Lt. Taylor, Capt. Harvey, "two John Does," Supt. Terry, C/O Dixon and Warden MacAdory. Counts 2, 5 and 6 survived threshold review. In Counts 2, 5 and 6, Shatner maintains that Defendants have violated his rights under the First, Fourth, Eighth and Fourteenth Amendments. Specifically, Shatner claims that Defendants have impermissibly limited his First Amendment ability to freely worship by refusing to allow him to possess Tarot cards, a penticle ring and a medallion and by confiscating his religious books (Count 2); that Defendants were deliberately indifferent to his serious medical needs as to his broken finger, dental cavities and back pain (Count 5); and that Defendants tampered with his legal mail by opening it outside his presence (Count 6).[1]

On May 1, 2006, Magistrate Judge Donald G. Wilkerson held a Final Pretrial Conference in this matter and certified the case ready for trial (Docs. 110 & 111). Subsequently, on May 12, 2006, Magistrate Judge Wilkerson entered the Final Pretrial Order ("FPTO")(Doc. 112).[2] On January 17, 2007, the Court entered an Order allowing Shatner's request to pursue punitive damages and to add Defendant Gilbert as a Defendant pursuant to Rule 60(a) (Doc. 126). Thereafter, on November 8, 2007, the Court granted Defendants' motion for summary judgment on the issue

---

[1]These remaining counts, 2, 5 and 6, against Defendants Page, Oliver, Frentzel, Pierce, Westerman, Dobbs, Gales, Cowan, Benefield, Stewart, Clark and Snyder survived summary judgment (See Docs. 61 and 69).

[2]As to Count 5, the medical indifference claim, the FPTO narrowed (by agreement of the parties) the issue to only Shatner's broken finger claim against Defendants Pierce, Frentzel, Clark and Snyder (Doc. 112, p. 2).

of injunctive relief as to Shatner's claims in Counts 2, 5 and 6 of the Amended Complaint (Doc. 145). The Court held another Final Pretrial Conference by telephone on April 22, 2008 (Doc. 146) and entered the new Final Pretrial Order on April 28, 2008 (Doc. 148).

The case proceeded to bench trial on Shatner's religious claims, Count 2, and his legal mail claim, Count 6, in this Court on May 12, 2008.[3] At the close of trial, the Court took the matter under advisement and directed the parties to file proposed findings of fact and conclusions of law. Those findings/conclusions have now been filed. Having heard the evidence in the case, having reviewed the parties' submissions, and in accord with **FEDERAL RULE OF CIVIL PROCEDURE 52**, the Court finds and concludes as follows.

## II. <u>Findings of Fact</u>

### A.    Parties

1.    Plaintiff, Darrin Shatner, is an inmate of the Illinois Department of Corrections. He was housed in the Condemned Unit at Menard Correctional Center ("Menard") from May 1997 until he was transferred to Stateville Correctional Center after the events at issue in this case.

2.    Shatner is a member of the Church of Light and the Rosicrucians. He has regularly practiced these faiths since at least 1998 to the present and is a true believer.

3.    According to Defendant Gilbert, Shatner was a good inmate and was no problem for the guards.

---

[3]On May 12, 2008, prior to the commencement of trial, Shatner orally dismissed with prejudice his medical claim as to his broken finger(Count 5) and the Court dismissed with prejudice Defendants Dwayne Clark and Donald Snyder (Doc. 150).

4.    Thomas Page was the Warden of Menard from January 1994 until April 1999. After January 1, 1999, he served as a Deputy Director of the Illinois Department of Corrections and had no further direct contact with Menard. As the warden, he had responsibility for the entire institution.

5.    Ian Oliver was the Assistant Warden of Programs for Menard from October 1997 to September 1999, when he was transferred to another institution.

6.    As an assistant warden of programs, Oliver had responsibility for program services for the inmates. He was involved in the denial of Shatner's religious medallion.

7.    Alan Frentzel was employed at Menard from August 16, 1986 to July 31, 2002. He was the Superintendent of the Condemned Unit from July 1, 1997 to July 31, 2001. He was an Assistant Warden from July 31, 2001 until his retirement.

8.    As a superintendent, Frentzel had responsibility for managing the Condemned Unit and North 1 for protective custody inmates. He was involved in the denial of Shatner's religious medallion.

9.    Roger Cowan was the Warden of Menard, either acting or officially, from January 1999 until he retired on July 31, 2001. As assistant warden of operations, he had the responsibility for the security at Menard, and as acting warden and warden, he had responsibility for the entire institution. Cowan was involved in the denial of Shatner's religious medallion and the confiscation of his religious books.

10.   William Pierce was a Captain in the Condemned Unit from October or November 1998 until his retirement in December 2001.

11.   As captain of the Condemned Unit, Captain Pierce was responsible for all the correctional officers, sergeants and lieutenants who worked on the Condemned Unit, and if any of them had a question about how to proceed, they were to consult Captain Pierce as their captain. Captain Pierce confiscated Shatner's religious materials and supervised correctional officers and lieutenants, who confiscated Shatner's religious materials.

12.   Darryl Westerman was a Correctional Lieutenant in the Condemned Unit at Menard at all times relevant in this case.

13.   In 1998 and 1999, Lieutenant Westerman worked on the Condemned Unit. As a lieutenant, he was responsible for all the correctional officers and

sergeants who worked on the Condemned Unit, and if any one of them had a question about how to proceed, they were to consult Lieutenant Westerman. Lieutenant Westerman reviewed Shatner's outgoing legal mail.

14. David Dobbs was a Correctional Officer at Menard at all times relevant in this case. He was a Correctional Officer on the Condemned Unit from 1998 to 2000.

15. Correctional Officer Dobbs was also the records retention coordinator at Menard from approximately 2003 through 2006. He participated in shakedowns of Shatner's cell and confiscated religious books.

16. Robert Gales was a Correctional Lieutenant at Menard from 1986 to 2000. He was a Correctional Captain at Menard from 2000 until he retired in 2002. He served on the Adjustment Committee while at Menard. He worked at Menard for twenty-eight years.

17. Lieutenant Gales, was responsible for property boxes and served as the chairman for the Adjustment Committee, a prison committee that hears disciplinary tickets and imposes a punishment. As the lieutenant responsible for the Adjustment Committee, Gales reviewed and approved tickets Shatner received.

18. Keith Benefield was a Correctional Officer at Menard from October 1997 until he transferred to Tamms Correctional Center on July 1, 2001. He was a correctional officer on the Condemned Unit from 1998 to 2000.

19. Officer Benefield participated in the shakedowns of Shatner's cell and confiscated religious books and Tarot cards.

20. Lamont Gilbert was a Correctional Lieutenant at Menard from November 1994 to the present.

21. As a lieutenant, Gilbert was responsible for all the correctional officers and sergeants who worked on the Condemned Unit, and if any one of them had a question about how to proceed, they were to consult Gilbert as their lieutenant. Gilbert supervised the correctional officers, who shook down Shatner's cell and he personally confiscated the Sacred Tarot.

22. Dennis Stewart was a Correctional Officer at Menard at all times relevant to this case.

23. During 1998, Stewart was a Correctional Officer on the Condemned Unit. He

collected Shatner's outgoing legal mail and brought it to Lieutenant Westerman.

**B.    Shatner's Legal Mail Claim**

24.    In December 1998, Shatner's criminal case was pending appeal. Terri Marroquin and John Greenlease were attorneys from the Illinois Office of the Appellate Defender, Capital Litigation Division representing Shatner during his criminal case. Ms. Marroquin is admitted to the bars of Texas, Oklahoma, Illinois and Mississippi.

25.    As an inmate on the Condemned Unit, Shatner regularly communicated with his attorneys through correspondence, visitation and rarely, by phone.

26.    There were approximately 20 cells in the Condemned Unit's segregation area, which were separated from the general Condemned Unit cells by a Plexiglas barrier. Shatner's cell in segregation had a solid door. It did not have bars like the non-segregation cells. None of the inmates on the Condemned Unit had cell mates, regardless of whether or not the inmate was in segregation.

27.    None of the Condemned Unit inmates interacted with the general population inmates at Menard. Further, when Shatner was on segregation, he received yard privileges only one day per week.

28.    Upon returning to his cell on or about December 28, 1998, Shatner found a woman's skirt that did not belong to him.

29.    Shatner believed that Lieutenant Westerman had planted the skirt in his cell in order to shake him down and then punish him for possessing contraband.

30.    Shatner was very upset by this discovery and felt that he should send the skirt to his attorneys as proof of the harassment he felt he was suffering at the hands of Lieutenant Westerman.

31.    Shatner had already prepared a letter to his attorney John Greenlease concerning a time-sensitive investigation related to his death penalty case. After finding the skirt in his cell, he wrote a second letter to attorney Terri Marroquin concerning the skirt, which he believed had been planted by Lieutenant Westerman. These two letters were prepared by Shatner so he could communicate information related to his criminal case and request legal assistance and intervention related to his incarceration at Menard and his treatment by IDOC staff.

32.    Shatner placed the two letters to his attorneys and the skirt in a legal-sized envelope and sealed it with tape.  He addressed the envelope to the Capital Litigation Division (where both attorneys worked) and marked the envelope "Legal Mail."  Nothing was "hanging out" of the envelope when Shatner sealed it.

33.    Shatner was extremely familiar with outgoing legal mail policy and procedure. As of December 1998, he had been sending privileged communications to his attorneys for nearly six years - since May 1993.

34.    After preparing the legal mail envelope containing the skirt and letters to his attorneys, Shatner placed it in the "chuckhole" of his cell door so it could be picked up by IDOC staff and sent by U.S. Mail.  Shatner believed the envelope was collected by IDOC staff and placed in the U.S. Mail.  He later received a disciplinary ticket prepared by Westerman based on that mailing.

35.    Officer Stewart was the IDOC staff member who collected the legal mail envelope from Shatner so it could be mailed.  Both Lieutenant Westerman and Officer Stewart testified that the envelope Shatner tried to send to his attorneys on December 28, 1998 was clearly marked as legal mail.  Lieutenant Westerman acknowledges that the envelope was sealed, and Officer Stewart testified that it was a normal sized legal manila envelope.

36.    Lieutenant Westerman was notified by Officer Stewart (either directly or through Sergeant Keeton) about Shatner's legal mail.  Upon arriving at the Condemned Unit, Lieutenant Westerman took Shatner's envelope from the armory.

37.    Lieutenant Westerman admits that the envelope was marked legal mail and contained a letter to Shatner's attorney.  He opened Shatner's legal mail and read the letter; he also admits that he wrote Shatner a disciplinary ticket based on the contents of that letter.

38.    The disciplinary ticket is dated December 28, 1998 and was signed by Lieutenant Westerman at 8:00 a.m.  The ticket states that Officer Stewart and Sergeant Keeton were witnesses to this incident.  Officer Stewart testified that he was present when Lieutenant Westerman opened Shatner's legal mail.

39.    Shatner never gave Lieutenant Westerman permission to read the letter. Nonetheless, Lieutenant Westerman did read Shatner's legal mail.  The disciplinary ticket itself further confirms that Lieutenant Westerman read Shatner's legal mail. Under the Observation section of the disciplinary ticket, Lieutenant Westerman wrote:

On the above date and time, this Lt. was notified by c/o Stewart that the above inmate had sent out a package that he had wrote legal mail on the envelope.  Upon searching this package this Lt. found a black mini skirt.  <u>Along with this package was a letter to a attorney stating that Lt. Westerman put the woman's skirt in his cell.  The above inmate told his attorney to take care of it the legal way or he would deal with it the convict way</u>.  This woman's skirt is unauthorized property.  ID by sight and OTS.

Lieutenant Westerman's observations in the disciplinary ticket came from statements Shatner wrote in his legal mail to his attorney, as confirmed by Shatner.

**C.  Menard Legal Mail Policies**

40.  At the time that Lieutenant Westerman read Shatner's legal mail, there were at least three documents containing legal mail policies that explained how IDOC staff at Menard should handle outgoing legal mail.

41.  Most broadly, Section 525.130 of Title 20 of the Illinois Administration Code, in effect on December 28, 1998, states: "Outgoing privileged mail must be clearly marked as 'privileged' and sealed by the committed person.  Outgoing mail which is clearly marked as privileged and addressed to a privileged party may not be opened for inspection."

42.  Specific to Menard, Institutional Directive 04.20.102, in effect in December 1998, and signed by Warden Page, "establish[ed] a written procedure governing the processing, handling and distribution of incoming and outgoing mail."  The policy concerning outgoing privileged mail states: "Outgoing privileged mail (no larger than a legal size manila mailing envelope) must clearly be marked a 'privileged' and sealed by the inmate. Such mail properly marked and addressed shall be X-rayed by Mail Office staff and/or examined by Internal Affairs in the presence of the inmate.  A stamp with the date and initials of the person X-raying/examining the privileged mail will be placed on the outside of the package."  The policy further states that outgoing privileged mail is "legal mail."

43.  Finally, discussing outgoing legal mail, the Condemned Unit Operations Manual in effect in December 1998 states: "Mail procedures as outlined by I.D. 04.20.102 shall be followed."  The Manual further states that "Legal or privileged packages which are properly marked, addressed, and sealed shall by X-rayed by the Personal Property Officer and/or examined by Internal

Affairs in the presence of the inmate.  A stamp with the date and initials of the person X-raying/examining the packages will be placed on the outside of the package."

44.    Lieutenant Westerman received training on the IDOC legal mail policy when he first became a corrections officer.  He also received annual training each of the 24 years of his employment with the IDOC, which included a review of all policies and procedures.  Additionally, if Lieutenant Westerman had any questions about the legal mail policy at Menard, he had access to the policies to review them himself or he could ask a supervisor to clarify the policy for him.

### D.  Legal Mail Policies Were Not Followed

45.    The envelope that Shatner tried to send to his attorneys on December 28, 1998 was sealed and clearly marked as legal mail.  Shatner's mail was search by Lieutenant Westerman in Officer Stewart's presence at 7:00 a.m. on December 28, 1998.  The disciplinary ticket does not indicate that an envelope was opened and searched in Shatner's presence.  The envelope was not opened in Shatner's presence.  Shatner never gave Lieutenant Westerman permission to read the letter to his attorney.

46.    Lieutenant Westerman did not X-ray Shatner's legal mail.  He was not a member of Internal Affairs.  No one from Internal Affairs opened Shatner's mail in his presence.

47.    It was a violation of the written prison policy for any officer not a member of Internal Affairs to open an inmate's outgoing legal mail - even if done in the inmate's presence.    There is no document that supports Lieutenant Westerman and Officer Stewart's handling of Shatner's legal mail as being in compliance with Menard or IDOC policy.  Warden  Page, the presiding warden in December 1998, expected every prison policy would be followed including the  legal mail policy.   Warden Pierce also testified that officers were not allowed to open outgoing legal mail - whether in the inmate's presence or not. Similarly, Superintendent Frentzel testified that it would not have been acceptable procedure for an officer to open an inmate's outgoing legal mail without Internal Affairs present.  Lieutenant Gales further confirmed that prison procedure required a review by Internal Affairs using an X-Ray if there was a concern about contraband in outgoing legal mail; only if Internal Affairs "found something in there" would the mail be opened and searched in the inmate's presence.

48.    Lieutenant   Westerman   did   nothing   to   ensure   that   Shatner's   legal

communications were sent to his attorney. Shatner was an inmate on death row and was not able to go to a post office or otherwise mail the letter himself. He was fully dependent on IDOC staff to ensure his legal communications were delivered to U.S. Postal Service for mailing.

49. Shatner's attorney, Ms. Marroquin, never received the letter he sent on December 28, 1998. The time-sensitive investigation, which was the subject of Shatner's letter to his attorney Mr. Greenlease and related to his death row case, never occurred.

50. Shatner sent his inmate copy of the December 28, 1998 disciplinary ticket to Ms. Marroquin. Marroquin testified at her deposition that the ticket became a "joke that many of us have retold" because "what kind of person would not only just write you up for sending, you know - for threats but quote something that they're not allowed to read."

51. Lieutenant Westerman's disciplinary ticket indicates that it was to be distributed to the inmate's Master File and to the Committed Person (inmate). However, the ticket was not located in Shatner's Master File, despite the fact that all tickets should have been maintained there, even those that are expunged. Neither the December 28, 1998 disciplinary ticket nor the prison's expungement file were never produced by Defendants during the course of this litigation.

52. On December 31, 1998, an Adjustment Committee hearing was held to review the disciplinary ticket that Lieutenant Westerman issued to Shatner. The Adjustment Committee is a prison committee that hears disciplinary tickets and imposes punishment. The proceedings of the Adjustment Committee are recorded in a summary document. The record of the proceedings and the committee's decision and disciplinary recommendations for Shatner's December 28, 1998 ticket were memorialized in an Adjustment Committee Summary.

53. The Adjustment Committee (and Lieutenant Gales, as a member of that committee) supported Lieutenant Westerman's disciplinary ticket and found Shatner guilty of all charges. The Committee recommended that Shatner be punished with three months of segregation, three months of demotion to C grade, and one month of privilege restrictions.

54. Shatner did not attend the Adjustment Committee hearing of the December 28, 1998 disciplinary ticket because he was concerned that "something else would happen" if he left his cell. Using an IDOC form, Shatner filed an official grievance on December 30, 1998 complaining that Lieutenant Westerman had

opened and read the letter to his attorney.

55. The Adjustment Committee Summary was expunged by Warden Page on January 6, 1999. It was very rare for these summaries and their recommendations to be expunged by the warden. Warden Page acknowledged that he must have thought some wrong had been committed for him to expunge an Adjustment Committee Summary. Since he was "not the type of warden to expunge a lot of tickets," Warden Page said he must have thought something happened to Shatner that should have not happened.

### E. Shatner's Religious Beliefs

#### i. The Church Of Light: A Hermetic And Stellar Based Faith

56. The Church of Light is a religious non-profit organization that is a stellar-based, hermetic faith. There are currently 800 to 900 active members worldwide.

57. Its chief tenet is to contribute to the utmost to universal welfare, with the goals that every individual should have freedom of religion, worship, expression, as well as freedom from want and fear. In order to achieve the goals, Church of Light members become familiar with the three branches: (1) astrology, (2) alchemy and (3) extrasensory perception (which includes directed thinking, and induced emotion (learning how to cultivate positive feelings)). Within these three branches are the two keys of the Church of Light: the gold key being astrology and the silver key being the Tarot.

58. Astrology represents a map of consciousness or a map of one's character, and is thus utilized by Church of Light members to improve and refine their character and find their role within God's plan for them.

59. Alchemy is an allegorical language in which the metals of alchemy correspond to the planets of astrology and is used for character development.

60. Extrasensory perception is used to allow Church of Light members to develop a personal relationship with God without using intermediaries, such as priests, ministers or interpreters.

61. There are 21 lessons used in the Church of Light for members to learn its teachings. The lessons are divided into three categories based on astrology, alchemy and extrasensory perception, with seven lessons for each category.

62. There is a book for each course with the exception of courses 10 and 12,

which have two books; thus there is a total of 23 Church of Light lesson books. The smallest book is 116 pages, and the largest is approximately 440 pages. The books range in price from $16.95 for the bookstore format, $19.95 for the hardbound books, and $22.95 to $24.95 for the student format.

63. The 23 lesson books are important to the Church of Light - without them, a member would not be able to follow the Church of Light's traditions as it is a faith based in study.

64. It is impossible to complete or pass one of the 21 lessons without the corresponding lesson book(s).

65. It takes an "enormous commitment" by a member to complete even one of the courses. Many of the courses, as described below, are difficult, and the lesson books are not written in contemporary language.

66. Only approximately 40 members have completed all 21 lessons. One who passes all 21 courses receives the title "Hermetician."

67. Course 1 is the Laws of Occultism, describing hidden natural forces that impact others.

68. Course 2 is Astrological Signatures, teaching the basic tenets of astrology, the planets, signs, houses and aspects.

69. Course 3 is Spiritual Alchemy, whereby the student learns to look at their life from the perspective of the impact of events upon their soul.

70. Course 4 is Ancient Masonry, which traces the origins of Freemasonry to the Hermetic past and stellar faith.

71. Course 5 is Esoteric Psychology, which teaches the metaphysical side of psychology.

72. Course 6 is the Sacred Tarot, one of the core lessons, that teaches the meaning and use of Tarot cards and the universal symbols therein.

73. Course 7 is Spiritual Astrology, which relates contemporary religious holidays to their origins in ancient stellar religion.

74. Course 8 is Horary Astrology, a branch of astrology that is used for answering specific questions.

75. Course 9 is Mental Alchemy, which trains the devotee how to think constructively.

76. Course 10 is Natal Astrology, which is broken into two lessons, Delineating the Horoscope, which teaches how to determine character, temperament, and disposition from an astrological chart, and Progressing the Horoscope, which teaches the predisposition toward events in one's life.

77. Course 11 is Divination and Character Reading, which trains the member regarding how divination works and the techniques involved in divination.

78. Course 12 is Natural Alchemy, which is broken into two lessons, Evolution of Life, describing life from its origins evolving towards even more complex forms, and Evolution of Religion, tracing the origins of religions from primitive societies through the contemporary world religions of today.

79. Course 13 is Mundane Astrology, teaching the astrology of politics and world events.

80. Course 14 is Occultism Applied, training members how to live a happier and more successful life.

81. Course 15 is Weather Predicting, teaching the astrological technique of using different planetary cycles to determine temperature, wind speed and moisture.

82. Course 16 is Stellar Healing, teaching basis stellar diagnosis and type of laying on hands of healing.

83. Course 17 is Cosmic Alchemy, teaching a devotee of the Church of Light how they should live within the world.

84. Course 18 is Imponderable Forces, describing the various influences upon people, such as thoughts or others and the impact of advertising.

85. Course 19 is Organic Alchemy, describing the evolution of life and the ceaseless search of life towards a more complex growth.

86. Course 20 is The Next Life, teaching the Church of Light's beliefs regarding what happens after physical life.

87. Course 21 is Personal Alchemy, teaching catechism and stellar dietetics.

88. The knowledge a Church of Light member learns from one course assists the

members in other courses as the knowledge is cumulative. All of the 21 courses are interrelated and there are references throughout the lesson books to other lesson books.

89.     A Church of Light member completes a course by reading the corresponding course book, and studying the material therein, and then applying for any examination and completing it and turning it in to the Church of Light headquarters to be graded. Until last year, the examinations consisted of essay questions; now they usually consist of 25 multiple-choice questions plus essay.

90.     In addition to and including the course lesson books, the Tarot cards, Scared Tarot and Ephemeris are essential tools to learn and carry out the Church of Light's tenets. The Ephemeris is a table that gives the longitude and latitude of every planet for every day using Greenwich Mean Time. When Shatner wanted spiritual advice, he would use Tarot cards or prepare an astrological chart. The Ephemeris is essential for preparing astrological charts. An astrological chart can provide information about the basic nature and character, influences and obstacles. Shatner's religious books provide critical information to interpret an astrological chart.

91.     The Tarot cards are a key part in practicing the Church of Light's faith. The Tarot cards are viewed as the oldest of the Church of Light's books. The Tarot is a set of 78 different symbols that originated in Egypt that represent the ancient text of the Book of Thoth written in the language of universal symbolism. The Church of Light believes that the 21 major Arcanum of the Tarot represent key steps in the movement of the soul in its involution into matter and evolution back to spirit. It is also used as a tool for divination mediation and contemplation.

92.     Modern-day playing cards are derived from Tarot cards. Both contain four suits and three of the courts cards (kings, queens and jacks). The difference is that Tarot cards are 78 cards to a deck and playing cars are 52 to a deck as the four horsemen and the 22 major Arcanum, which are symbols of initiation, have been removed.

93.     The Tarot cards are similar to Christianity's use of icons, usually found in paintings of holy personages that represent the moral qualities that many aspire toward in life.

94.     Without the Tarot cards, a Church of Light member's ability to practice the tenets of the faith would be greatly hindered.

95.     The Church of Light does not condone the use of Tarot cards for gambling as the Church of Light does not believe that gambling is a constructive contribution to society because money is gained based on the loss of others and not through providing a product or service to the world.

96.     The use of the Tarot cards to control or cause harm to others is not condoned by the Church of Light and is completely against the Church of Light's faith. The Church of Light does not believe in doing anything to harm another individual or using any Church of Life technique to try to manipulate or control another.

97.     The Sacred Tarot Book is the core body of the Church of Light's knowledge. The Scared Tarot serves as an encyclopedia of knowledge about the Tarot and relates meanings to each of the cards. The Sacred Tarot explains how to use the Tarot cards for divination, contemplation, and mediation and relates the Tarot cards back to things such as the Bible, Freemasonic tradition, and the Church of Light's traditions.

98.     The Sacred Tarot and the corresponding course are key to a Church of Light member's studies. The Sacred Tarot also relates to each of the 21 lessons because each one of the 21 lessons corresponds to the first 21 major Arcanum of the Tarot. Thus, the Sacred Tarot synchronizes the information from all the lessons. Mr. Gibson, a Church of Light Board of Director and one of the few Hermeticians in the religion, testified that he has read the Sacred Tarot about 16 times and that he repeatedly consults the Sacred Tarot.

99.     Texts equivalent to the Sacred Tarot in other religions are the New Testament in Christianity, the Torah of Jews, the Koran of Muslims and the Vedas of Hinduism.

100.   If a Church of Light member does not have access to a computer, the Ephemeris is essential to creating astrological charts and completing the necessary calculations for the charts. The Church of Light sells the Rosicrucian 100-year Ephemeris for 1900 to 2000 for $37.75; the Rosicrucian 100-year Ephemeris for 2000 to 2100 for $45.00, and a 50-year Rosicrucian Ephemeris for $23.00.

### ii.  Rosicrucian Faith

101.   Shatner is also a member and disciple of the Rosicrucian faith practiced by the Rosicrucian Fellowship. He began practicing the Rosicrucian faith at or about the same time he started following the Church of Light. Similar to the Church of Light, the Rosicrucian faith is a Christian and hermetic faith.

102. As part of his Rosicrucian faith, Shatner studied different courses. These courses included four astrological courses, two philosophy courses and a course on Western Bible teachings. Shatner was also required to study the works of Max Heindel including the Message of the Stars and the Rosicrucian Cosmal Conception.

103. In practicing his Rosicrucian faith, Shatner studied the books of the Rosicrucian faith, including the Max Heindel books. He then would answer questions regarding these books and return these answers to the Rosicrucians. He also kept the vegetarian diet of the Rosicrucian faith.

104. The Rosicrucian cross and the pentagram are important symbols of the Rosicrucian faith. It is the belief of the faith that the pentagram was used by King Solomon to ward off evil spirits; and Shatner uses it to communicate with angels and other spirits. The pentagram needs to be made from metal – silver, gold, tin or copper.

105. The Church of Light and Rosicrucian traditions are very similar; both are hermetic faiths with their origins from Europe during the mid-18th century. Many members of the Church of Light have also done Rosicrucians studies. The Church of Light is accepting of its members studying other faiths, including Rosicrucianism, and encourages its members to study as much as they can about other faiths so they can draw their own conclusions.

**F.  Shatner's Religious Practices At Menard**

106. Shatner has been a member of the Church of Light since 1998. Shatner was a member of the Church of Light while incarcerated at Menard and was still a member of the Church of Light as of the time of trial.

107. Shatner began studying the hermetic religions, the study of nature and science, to prepare himself for death. While at Menard, he studied the Church of Light's and Rosicrucianism's teachings. He bought and acquired books regarding the religions while at Menard in order to learn their tenets.

108. Shatner passed 12 of the Church of Light's courses. He first passed Course 5, Esoteric Psychology, in 1998.

109. He passed Course 2, Astrological Signatures, in January 1999.

110. He passed Course 1, Laws of Occultism, in March 1999.

111. In October 1999, Shatner passed Course 3, Spiritual Alchemy, and Course 4, Ancient Masonry.

112. Shatner passed Course 7, Spiritual Astrology, in June 2000.

113. In August 2000, Shatner passed Course 6, Sacred Tarot. He purchased the Sacred Tarot at least three times. The Sacred Tarot was the foundation of his belief system.

114. In October 2003, Shatner passed Course 8, Horary Astrology and Course 9, Mental Alchemy.

115. Subsequently, Shatner passed Course 10, Natal Astrology, in December 2003.

116. Then he passed Course 12, Natural Alchemy, in June 2007.

117. Most recently, Shatner passed Course 11, Divination and Character Reading, in July 2007.

118. That Shatner passed 12 courses in 10 years reflects an enormous commitment to the Church of Light.

119. To have passed the 12 courses, Shatner needed to have the corresponding lesson books.

120. Shatner also used Tarot cards to practice his religion daily. The Sacred Tarot taught Shatner how each specific Tarot card was associated with each astrological symbol in the heavens.

121. Without access to the Sacred Tarot, Shatner's ability to practice the Church of Light's faith would be greatly restricted.

122. Without access to the Tarot cards, Shatner's ability to practice the Church of Light's faith would be greatly limited.

123. Without access to either the Church of Light's lesson books or the Tarot cards, Shatner would be unable to practice the tenets of the Church of Light.

124. Shatner received all his religious books through the mail. According to the prison's regulations, the prison would have to approve the books before they were delivered to the inmate. Therefore, it can be inferred that Shatner's religious books went through this approval process before being delivered to Shatner.

### G. Defendants' Knowledge Of And Response To Shatner's Religious Practices

#### i. Shatner Informed The Prison About His Change Of Religion And It Was Approved

125. Shatner completed a change of religious affiliation form while at Menard from Wicca to Rosicrucianism and Church of Light on December 3, 1998. Shatner also provided documentation supporting his affiliation with the Rosicrucian Faith.

126. Shatner's change in religious affiliation was approved by both Fr. Hayes and Chaplain Keim.

#### ii. The Guards Misunderstood Shatner's Religion

127. While at Menard, Defendants Westerman, Benefield, Pierce, Gilbert and Dobbs called Shatner "Devil Worship Shatner," "Dam[n] Devil Worshipper" and other names having to do with Satanism or the devil. Moreover, Officer Dobbs testified that he believed that Shatner practiced Satanism.

128. Shatner's attorney, Ms. Marroquin, testified that when she would visit Shatner at Menard the guards would call him a "devil worshipper" or say "Why are you going to see him? Don't you know that he worships Satan?"

129. Ms. Marroquin further stated that she never heard discriminatory comments like that about any of her other clients on the Condemned Unit at Menard, and never had problems visiting any of her clients at Menard other than Shatner and another client who had attacked a guard. She testified that she would simply "get more hassle" when she would visit Shatner.

130. Further, when Ms. Marroquin received phone calls from Shatner while he was at Menard, the guards would yell obscenities at him.

131. Shatner's religious beliefs have nothing to do with Satanism or devil worshippers. Shatner attempted to educate the prison officials about the true tenets of his religion by writing letters, filing grievances and explaining his religion to people.

### H. Shatner's Religous Books And Sacred Tarot Cards Were Confiscated

132. Shatner's religious books and Tarot cards were repeatedly confiscated while

he was at Menard.

### i. Menard Policies

133. IDOC maintains a Publication Review Committee. The Publication Review Committee reviews books and decides whether the books are approved or disapproved in Menard and the other IDOC facilities. To document review of books, the Publications Review Committee maintains an Adult Banned List and an Adult Disapproved List for books and other publications. The Sacred Tarot was not on either of these lists.

134. When books or other publications enter an IDOC facility through the mail, the mailroom is responsible for reviewing the book or other publication, and questionable publications are sent to the Publication Review Committee for review before being sent to the inmate. Thus, books and other publications sent to an inmate through the mail and received by the inmate are approved by the Publication Review Committee.

135. When an inmate had excess items, the inmate was allowed to determine which items to get rid of.

136. Shatner kept all his books in his property box. The books were in no particular order in his property box and his religious books, such as his Sacred Tarot, Ephemeris and Church of Light books, were mixed in with his non-religious books.

### ii. Shatner's Sacred Tarot Was Confiscated Repeatedly

137. On or about September 12, 2000, Captain Pierce, Lt. Gilbert, and Officer Benefield confiscated Shatner's Tarot cards, along with his Sacred Tarot.

138. Initially, Shatner's Tarot cards were confiscated by Officer Benefield at the direction of Captain Pierce. The Tarot cards were confiscated in spite of Shatner stating that he needed the Tarot cards to practice his religion.

139. Soon thereafter, in an effort to get his Tarot Cards back, Shatner attempted to demonstrate how Tarot cards were vital to his ability to practice his religion by showing Lt. Gilbert the Sacred Tarot, the companion book to the Tarot cards. Lt. Gilbert, however, confiscated the Sacred Tarot as well.

140. Lt. Gilbert confiscated the Sacred Tarot because he decided on an "ad hoc basis" that Shatner's religion was "not recognized by Menard" - despite the fact that not only was Shatner's change of status form affiliating himself with the

Church of Light approved, but it was not Lt. Gilbert's job to determine whether a religion is recognized. Moreover, Lt. Gilbert did not consult the IDOC's approved, disapproved, or banned book lists when confiscating Shatner's Sacred Tarot.

141. Lt. Gilbert states that he confiscated the Sacred Tarot because of a purported concern that Shatner might use the Tarot cards to influence other prisoners. But when asked by the Court for factual examples of what Shatner was doing to possibly exercise undue influence over other inmates, the best answer Lt. Gilbert could give was that the inmates would "talk[] amongst each other and they would always look to [Shatner] as being the leader of this little clique...." The Court challenged these speculative justifications by asking whether, if an inmate who had a Bible became "too much of a leader" among the inmates, and they were all "spouting Bible verses," he would take the Bible away. Lt. Gilbert said that he would not confiscate the Bible.

142. Captain Pierce approved Lt. Gilbert's confiscation of the Sacred Tarot on or about September 12, 2000. In the disciplinary ticket written regarding the confiscation, there is no mention that Shatner was over the limit of the number of books he was allowed to have in his cell. Instead, Captain Pierce simply thought that Shatner "should not have the book."

143. When Lt. Gilbert took the Sacred Tarot away from Shatner on or about September 12, 2000, Shatner was devastated because all he wanted to do was practice his religion. Lt. Gilbert told him his religion is "devil worship" and he was taking the book. Shatner filed a grievance about the incident.

144. Shatner never received his Sacred Tarot back and had to repurchase it, in addition to being deprived of his ability to practice his religion.

145. As a result of this incident, Shatner contacted the Church of Light and asked for their assistance in getting his Tarot cards and Sacred Tarot back. At Shatner's request, Dr. Whissler prepared another letter, this time to Deputy Director Clark, in which she stated that "[k]nowledge of the Sacred Tarot and Egyptian Tarot cards is necessary for members to practice the teachings of the [C]hurch [of Light]."

146. Neither the Tarot cards nor the Sacred Tarot were returned to Shatner, even though the Sacred Tarot was "essential" to his ability to use the Tarot cards, a vital part of his faith.

147. Additionally, Defendants Benefield, Westerman, Pierce and Gilbert confiscated Shatner's Sacred Tarot in March 2000. During this confiscation, Shatner's

Sacred Tarot was confiscated, along with his other religious books, even though these religious books were intermixed in his box with non-religious books.

148. Defendants Benefield, Westerman, Pierce and Gilbert believed these books were "devil books," Shatner explained to Pierce that the Sacred Tarot and his other religious books were necessary for him to be able to practice his religion, but Pierce did not care: the Sacred Tarot and the other religious books were still "devil books" in his opinion.

149. Shatner offered to trade his non-religious books that were not being confiscated so he could have his religious books back, but Defendants Benefield, Westerman, Pierce and Gilbert denied Shatner this opportunity.

150. Shatner filed a grievance regarding the March 2000 confiscation of the Sacred Tarot and his other religious books, but nothing came of it.

151. On July 30, 2000, Shatner's Sacred Tarot was taken again, along with all his other religious books, by Officer Benefield. Similar to the March 2000 incident, the Sacred Tarot and Shatner's other religious books were mixed in his storage box with other non-religious books, yet no non-religious book was taken.

152. Shatner filed a grievance on July 30, 2000 regarding the confiscation. In the grievance, he asked to have his religious books back and stated that he would give up other books in order for that to happen. Shatner's request was not granted. Instead, Defendant Benefield wrote Shatner a ticket for having too many books and the Adjustment Committee found Shatner guilty of the infraction.

### iii. Shatner's Tarot Cards Were Confiscated

153. As stated previously, on or about September 12, 2000, Pierce, Gilbert, and Benefield first confiscated Shatner's Tarot cards along with his Sacred Tarot.

154. Shatner's Tarot cards were confiscated by Benefield at the direction of Captain Pierce. The Tarot cards were confiscated in spite of Shatner stating that he needed the Tarot cards to practice his religion.

155. On September 30, 2000, another deck of Tarot cards was confiscated by Pierce. On or about that time, Shatner received books in the mail from the Rosicrucian Fellowship, and before Pierce would allow Shatner to have the books, he shook down his cell. During the shakedown, Pierce confiscated

Shatner's Tarot cards and all the books in his storage box in his cell. Shatner told Pierce that he needed the Tarot cards to practice his religion, but Pierce "didn't care what" Shatner had to say, as the Tarot cards are "devil worship" materials.

156. On or about October 4, 2000, Shatner wrote a grievance about the September 30, 2000 incident to Director Clark, Warden Cowan, Warden MacAdory and Superintendent Frentzel. Shatner "wanted everyone in the chain of command to understand the torture [he] was going through" and how he was being "targeted" in a "witch hunt," and also "educate them and explain my religious beliefs." Shatner stated: "I would like to make you aware that my religious beliefs and spiritual beliefs and practices are sincere, and to point out my religion is of the heavens, stars, constellations. They are for the Religion of the Stars, the overall and above all else my religion." He went on to state that "there can be no doubt whatsoever that the Sacred Tarot is, in fact, a religious tool for me." Shatner asked in the letter for his religious materials, the Tarot cards, the Sacred Tarot, and his religious books, to be returned, but they were never returned.

### iv. Shatner's Religious Books Were Confiscated

157. Defendants Benefield, Westerman, Pierce and Gilbert confiscated Shatner's religious books in March 2000. During this confiscation, only Shatner's religious books were confiscated, even though the religious books were intermixed in his box with non-religious books.

158. Shatner had a variety of books. He had books from the Rosicrucian Fellowship, the Church of Light, Kessinger Publishing, and novels from a number of authors, including Ann Rice, Stephen King, Robert Jordan, and Terry Goodkind. His religious books included the Ephermeris, the Sacred Tarot, and other books from the Church of Light and the Rosicrucian Fellowship.

159. Defendants Benefield, Westerman, Pierce and Gilbert believed these books were "devil books." Shatner explained to Pierce that these religious books were necessary for him to be able to practice his religion, but Pierce did not care, these religious books were still "devil books" in his opinion.

160. Shatner offered to trade his non-religious books that were not being confiscated so he could have his religious books back, but Defendants Benefield, Westerman, Pierce, and Gilbert denied Shatner this opportunity.

161. Shatner filed a grievance regarding the March 2000 confiscation of his

religious books.  In his grievance, Shatner specifically asked: "if I could trade 7 other books I had because the books taken were religious; 3 of them were from my Church."  Shatner's grievance was denied, and his books were not returned.

162.  On July 30, 2000, Shatner's religious books were confiscated again by Benefield.  Similar to the March 2000 incident, Shatner's religious books were mixed in his storage box with other non-religious books, and, Benefield confiscated only Shatner's religious books and not any of his non-religious books.  Benefield confiscated the Ephemeris, Shatner's religious astrology and alchemy books, and a number of religious books from Kessinger Publishing.  The Kessinger Publishing books had Masonic symbols on their covers.

163.  Following the confiscation and on the same day, Shatner filed a grievance requesting that his religious books be returned to him.  In his grievance, he said: "I will give the other [books] up so that I only have 15 books."  Shatner's grievance was denied.  Instead, Defendant Benefield wrote Shatner a ticket for having too many books, and the Adjustment Committee found Shatner guilty of the infraction.  The ticket stated: "confiscated 23-Excess Magazines and 16-Excess Books."

164.  On September 30, 2000, Shatner received books in the mail from the Rosicrucian Fellowship, but before Pierce would allow Shatner to have the books, Pierce shook down Shatner's cell.  During the shakedown, Pierce took all the religious books from Shatner's storage box.  These books included the Ephemeris, all of Shatner's Church of Light books and all the books written by Max Heindel.

165.  On or about October 4, 2000, Shatner wrote a grievance about the September 30, 2000 incident to Director Clark, Warden Cowan, Warden MacAdory and Superintendent Frentzel.  Shatner "wanted everyone in the chain of command to understand the torture [he] was going through" and how he "was being targeted" in a "witch hunt," and also "educate them and explain my religious beliefs."  Shatner stated: "I would like to make you aware that my religious beliefs and spiritual beliefs and practices are sincere, and to point out my religion is of the heavens, stars, constellations.  They are for the Religion of the Stars, the overall and above all else my religion."  He went on to state: "there can be no doubt whatsoever that the Sacred Tarot is, in fact, a religious tool for me."  Shatner asked in the letter for his religious materials, the Tarot cards, the Sacred Tarot, and his other religious books to be returned, but they were never returned.

166.  Shatner's confiscated religious books included "Symbolic Language of Ancient

Art and Mythology," Old Tales Retold from Grecian Mythology," "The Gospel of the Stars," "History of Magic," "Chaldean Magic," "The Dawn of Astronomy," "Elements of Astrology," and "Astrology of the Old Testament or Lost World Regained." The total value of these confiscated books was $653.60.

167. Shatner also had to replace his Ephemeris book three times and Sacred Tarot book multiple times. The Ephemeris costs $45, plus $5 shipping and handling.

**I. Shatner's Tarot Cards Were Confiscated**

168. In deciding whether to permit Shatner to have his Tarot cards, Superintendent Frentzel did not consider information from the Church of Light regarding the importance of the Tarot cards.

169. Defendants presented no evidence that Shatner used his Tarot cards for any improper purpose. At no time did Shatner ever use the Tarot cards for gambling, as it would be "wrong" in the eyes of the Church of Light. Shatner also never used the Tarot cards to try to manipulate another person. He testified that he would never "misuse the Tarot or astrology," as "that would be the ultimate sin in [his] eyes." Shatner further testified that "to use the Tarot or astrology or even palmistry in any negative manner would take away any kind of purity you had obtained. It would destroy any moral value you have within your soul, mind, or being. It's blasphemy...."

170. Even though Defendants claim that Tarot cards were not allowed at Menard, Lt. Ferrell, who has been with the IDOC since 1994, stated that another inmate at Menard used Tarot cards. The inmate would be allowed to use the Tarot cards by himself in the visitors room. Major Young also testified that he has seen an inmate allowed to use Tarot cards.

171. Defendants stated that they denied Shatner access to his Tarot card because of gambling concerns. But inmates are allowed to have other materials that could just as easily be used for gambling, including playing cards, pinochle cards, dominoes, checkers and chess in addition to betting on scores of sports games. Defendants testified that inmates could use both playing and pinochle cards for gambling purposes. Shatner testified that he never gambled.

**J. Shatner Was Denied Access To His Religious Medallion**

**i. IDOC's Religious Medallion Policy**

172. The Menard personal property policy provided that: "An inmate may possess

one each of the following jewelry permit items: b. Religious medallion (1"
diameter maximum) with chain - not to exceed $50.00 in value."

173. The IDOC's policy permitted five- and six-pointed stars before 2006. This is
confirmed by the fact that: (1) the Defendants produced no policy, regulation,
or directive indicating that five- or six-pointed stars were not permitted prior
to 2006; and (2) in April 2006, the IDOC policy changed and a bulletin was
sent to inmates and staff titled: "Revised Personal Property Policy, Five - and
Six-point Stars." The bulletin read: "In accordance with newly revised
Department policy, any offender who is currently in possession of a medallion
or other religious item in the shape of a five- or six-point star must have that
item shipped out or picked up before May 3rd 2006. After that date, these
items will be confiscated as contraband and disposed of in accordance with
Department Rule 501.230." The bulletin further read: "A religious item which
is not star-shaped but has a five- or six-point star or stars on it as part of a
larger composition, such as a medallion with a crescent moon and a small star
in its curve or a medallion with of a saint with a halo of stars is still
permissible.

## ii.  Shatner's Medallion Was A Symbol Of His Religious Beliefs

174. While at Menard, Shatner requested permission to wear a religious medallion -
a pentagram. A pentagram is an enclosed five-pointed star. Shatner's
pentagram has a circle around the star and has no sharp edges.

175. The pentagram has an ancient history and religious meaning. The five points
of the pentagram represent the Hebrew letters Hod, He, Vuv, He and Shin.
Together, these letters represent the word Jesus. In the Hermetic tradition,
the five points of the pentagram represent earth, air, fire, water and spirit.

176. The pentagram is also a symbol of the Rosicrucian Church. In Shatner's
beliefs, the pentagram serves to ward of evil spirits. He testified that: "the
pentagram is a symbol of protection against any evil entity or unwanted spirit."
Thus, for Shatner, the pentagram is necessary for him to pray to spirit.

177. Fr. Hayes, senior chaplain at Menard, reviewed and determined that:
"[W]ithout any doubts [Shatner's religious medallion] is significant to his
religion THE ROSICRUCIAN FELLOWSHIP and that it is a legitimate
expression of his faith and beliefs."

178. Allen Edwall of the Rosicrucian Fellowship explained:

I am writing this letter on behalf of Darrin Shatner #B-42950.

Apparently, he would like to wear a pendent we produce and you have not allowed him to wear this. I will do my best to explain to you that we have no requirements that anyone wear our emblem, which is the Rose Cross upon a 5-pointed star. Anyone is free to wear or not wear whatever they choose. If the emblem helps to remind someone of the spiritual principles it represents, then that is their own choosing.

I understand that there is some concern on your part about the 5-pointed star. You will notice on our letterhead that a single point faces straight up. Black magic and Satan worshippers use the 5-pointed star, but they display it with two points up. I have enclosed a pamphlet that you may wish to read regarding the symbology of our emblem. The Rosicrucian Fellowship is an entirely Christian organization and we encourage our members to join the Christian church of their choosing. Being a member of our organization does not preclude anyone from being a member of the Christian Church (or any church) of their choice.

179. In another letter, Mr. Edwall further explained: "The 5 point star is a significant part of our symbols and a legitimate expression of our beliefs."

### iii. Defendants Deny Shatner the Right To Have His Medallion Because They Believed It Was Not Necessary To Or Required By His Religion

180. Shatner was denied his medallion because it was not a mandatory requirement of his faith.

181. On July 29, 1999, Superintendent Frentzel faxed the Rosicrucian Fellowship to inquire whether Shatner's pentagram was required: "I have attached a photocopy of a medallion that our inmate Darrin Shatner (Shat00) has claimed that he needs in order to comply with the religious requirements of a Rosicrucian. I would like to know if this is a requirement considering the security issues of a condemned unit maximum security institution."

182. On August 9, 1999, Warden Oliver denied Shatner's request to have his religious medallion. Warden Oliver indicated that Shatner could not have his medallion because the medallion was not required by his religion.

183. On March 15, 2000, Warden Cowan explained to the IDOC's Administrative Review Board that:

In one correspondence, the Representative stated that it is not a mandatory requirement for one to wear this emblem, it is completely up to the individual. Then in another correspondence, the same Representative stated that it is a significant part of their symbols and

legitimate expression of the faith beliefs. Therefore, we denied his request.

184. None of these documents indicated that Defendants denied Shatner's request for his religious medallion because Shatner's religious medallion was a gang symbol. Shatner was not affiliated with a gang while at Menard.

## III. Conclusions of Law

### A. Legal Mail Claim

1. Shatner's legal mail claim is brought pursuant to 42 U.S.C. § 1983 against Lt. Westerman and Officer Stewart. Defendants Westerman and Stewart violated Shatner's constitutional rights by interfering wiht his outgoing legal mail while he was incarcerated at Menard.

2. Prisoners have First Amendment free speech rights related to both the sending and receiving of mail. *See, e.g., Thornburgh v. Abbott*, **490 U.S. 401, 407 (1989);** *Turner v. Safley*, **482 U.S. 78, 84 (1987)("Prison walls do not form a barrier separating prison inmates from the protections of the Constitution.")**. Further, the Fourteenth Amendment affords prisoners a due process right to adequate, effective and meaningful access to the courts. *See Bounds v. Smith*, **430 U.S. 817, 824 (1977)**. The United States Supreme Court "has recognized that prisoners have a protected First Amendment interests in sending and receiving mail ... [and that] [p]rison regulations or practices that affect a prisoner's legal mail are of particular concern because of the potential for interference with a prisoner's right of access to courts." *Rowe v. Shake*, **196 F.3d 778, 782 (7th Cir. 1999)**.

3. Prison officials may open and inspect a prisoner's legal mail as long as it is done in the prisoner's presence and the mail is not read by the inspector. *Wolff v. McDonnell*, **418 U.S. 539, 577 (1974);** *see also Bach v. Illinois*, **504 F.2d 1100, 1102 (7th Cir.), cert. denied, 418 U.S. 910 (1974)**. An inmate's right to free speech and free association may be violated if prison officials open privileged mail to or from an attorney or mail is delayed for an inordinate amount of time. *See Antonelli v. Sheahan*, **81 F.3d 1422, 1431-32 (7th Cir. 1996)**.

4. Outgoing mail from prisoners to their attorneys does not pose the same security concerns as incoming mail and is thus entitled to greater protection. *See Watson v. Cain*, **846 F.Supp. 621, 626 (N.D. Ill. 1993)(Aspen, J.)(citing *Taylor v. Sterrett*, **532 F.2d 462, 474 (5th Cir. 1976))("it must**

be assumed that mail addressed to ... licensed attorneys containing
**contraband or information about illegal activities will be treated by the
recipients in a manner that cannot cause harm.")**.  Ultimately, "the
penological interests for the interference with outgoing mail must be more
than just the general security interest which justifies most interference with
incoming mail." **Cancel v. Goord, 2001 WL 303713, at * 7 (S.D.N.Y.
March 29, 2001)(McKenna, J.)**.

5.      Additionally, "to be held individually liable, a defendant must be personally
        responsible for [depriving the prisoner] of a constitutional right." **Sanville v.
        McCaughtry, 266 F.3d 724, 740 (7th Cir. 2001)**.  Although "direct
        involvement in the deprivation is not required," such direct participation is
        sufficient for a finding of personal involvement. **See Black v. Lane,22 F.3d
        1395, 1401 (7th Cir. 1994)**.  Even where a defendant did not directly
        participate in the constitutional violation, he can meet the personal
        involvement requirement if he "acts or fails to act with a deliberate or reckless
        disregard of plaintiff's constitutional rights..." **Smith v. Rowe, 761 F.2d
        360, 369 (7th Cir. 1985)**.

6.      To establish a claim under 42 U.S.C. § 1983 for retaliation in violation of an
        inmate's constitutionally protected rights, the plaintiff-inmate must establish
        that: (1) he engaged in constitutionally protected conduct; and (2) such
        conduct was a substantial or motivating factor behind the retaliatory acts. **See
        Thomas v. Walton, 461 F.Supp.2d 786, 795-97 (S.D. Ill. 2006)**.  The
        Seventh Circuit has recognized retaliation claims in the context of prisoner
        litigation.  **See Walker v. Thompson, 288 F.3d 1005, 1008-09 (7th Cir.
        2005)**.

7.      By sending a privileged letter to his attorneys, Shatner was engaging in
        constitutionally protected conduct.  His outgoing mail to his attorneys
        complied with all applicable prison regulations.  Lt. Westerman and Officer
        Stewart have admitted that the envelope was sealed and marked legal mail.
        Lt. Westerman has admitted (after initially denying it) that he read Shatner's
        letter to his attorney, and that he punished him with a disciplinary ticket
        based on the contents of the letter.  A person of ordinary firmness would be
        deterred from writing privileged communications to his attorney if he believed
        his communications would be read by prison officials and he would be subject
        to disciplinary action based on those communications.

8.      Whether or not Shatner's legal mail was opened in his presence, Lt.
        Westerman's reading of the letter was an egregious violation of Shatner's
        constitutional rights.  Officer Stewart is liable for the violation since he was

present at the time the legal mail was read. He was similarly informed of the applicable prison policies regarding outgoing legal mail, and yet he took no actions to protect Shatner's constitutional rights. ***See Smith*, 761 F.2d at 369**.

9.  In short, there was absolutely no basis for Lt. Westerman to actually read Shatner's legal mail. His actions violated all relevant outgoing legal mail policies of the prison, and clearly he was aware that his actions were in violation of these policies. As a result of Lt. Westernman's actions and Officer Stewart's failure to intervene, Shatner's legal mail, which contained time-sensitive information, never made it to Shatner's attorneys, who were handling his death penalty case.

**B.    Defendants violated Shatner's Rights To The Exercise Of His Religion Under the First Amendment, The Religious Land Use And Institutionalized Persons Act, And The Illinois Religious Freedom Restoration Act**

**i.  Legal Standards**

10.  Prison inmates do not lose their First Amendment right to free exercise of religion by virtue of their confinement. ***Turner*, 482 U.S. at 84. ("Prison walls do not form a barrier separating prison inmates from the protections of the Constitution.")**. "An inmate retains the right to exercise his religious beliefs in prison." ***Kaufman v. McCaughtry*, 419 F.3d 678, 683 (7th Cir. 2005)**. To prove a violation of the First Amendment, Shatner must prove that his religious beliefs are sincere, that his religious materials are important to his belief system, that there is a basis for his belief in the importance of these religious practices, and that Defendants have deprived him of his religious materials. ***Id.*** If Shatner proves these elements, Defendants may show that they did not violate Shatner's Fist Amendment rights by demonstrating a legitimate penological interest. ***Turner*, 482 U.S. at 84**.

11.  To prove his claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), Shatner must prove that he sincerely believes in his faith, that using his religious materials is a religious exercise according to his faith, and that Defendants' actions in denying and confiscating Shatner's religious materials have placed a substantial burden on his ability to practice his faith. **42 U.S.C. § 2000cc-1(a)**. If Shatner proves these elements, Defendants may show that their actions were justified under RLUIPA. To do that, Defendants must prove that the IDOC has a compelling governmental interest, that Defendants' actions in denying Shatner access to his religious materials

actually served IDOC's interests, and that IDOC's interests could not have been served without denying Shatner access to his religious materials. **42 U.S.C. § 2000cc-1(a)**.

12. To establish his claim under Illinois Religious Freedom Restoration Act ("IRFRA"), Shatner must prove that he sincerely believes in his faith, that using his religious materials is a religious exercise according to his faith, and that Defendants' actions in denying and confiscating Shatner's religious materials have placed a substantial burden on his ability to practice his faith. **735 ILCS 35/15**. If Shatner proves these elements, Defendants may show that their actions were justified under IRFRA. To do that, Defendants must prove that the IDOC has a compelling governmental interest, that Defendants' actions in denying Shatner access to his religious materials actually served IDOC's interests, and that IDOC's interests could not have been served without denying Shatner access to his religious materials. **775 ILCS 35/15**.

13. Shatner, by credible testimony, is a true and sincere believer. Shatner has been a member of the Church of Light and the Rosicrucian Fellowship since 1998 and has been practicing these faiths since then. He regularly reads and studies religious books regarding these faiths including the Sacred Tarot. In seeking spiritual guidance, he practices with the Tarot cards and astrological charts. He has passed 12 of the 21 lessons of the Church of Light further proving his dedication and belief of the Church of Light. As a member in good standing of the Rosicrucian Fellowship, Shatner has passed numerous courses. At trial, Shatner explained to the Court that he is a true believer of both the Church of Light and the Rosicrucian Fellowship.

14. As explained below, Shatner needs his religious materials, including the Sacred Tarot, the Tarot cards, his religious books and his religious medallion to practice his religion, and Defendants' actions have deprived him of these religious materials.

### ii. Defendants' Burden To Establish A Legitimate Penological Interest

15. In order to show that the deprivation of Shatner's religious freedom through the denial of his access to his religious materials was justified under the Free Exercise Clause of the First Amendment, Defendants must prove, by a preponderance of the evidence, that the denial of Shatner's access to religious materials was "reasonably related to legitimate penological interests." ***Turner*, 482 U.S. at 89**. In ***Turner***, the Supreme Court set out four factors that are to be considered by a court in determining whether a regulation infringing

upon an inmate's First Amendment freedom bears a reasonable relationship to a legitimate penological interest: (1) whether the regulation is "rationally related" to a "legitimate and neutral" governmental interest; (2) whether the inmate possesses "alternative means" of exercising the right in question; (3) the impact that accommodation of the inmate's constitutional right would have on guards, other inmates and the allocation of prison resources; and (4) whether there exist "obvious, easy alternatives" to the regulation. ***Thornburgh*, 490 U.S. at 414-18 (citing *Tuner*, 482 U.S. at 90-91)**. Application of these factors to the denial of Shatner's access to his religious materials demonstrates that Defendants have failed to establish the existence of a legitimate penological interest reasonably related to the denial of Shatner's access to his religious materials. Consequently, Defendants have failed to meet their burden of proof with respect to Shatner's First Amendment claim.

16.   The first ***Turner*** factor is concerned with the existence of a "valid, rational connection between the prison regulation at issue and the "legitimate governmental interest put forward to justify it." ***Turner*, 482 U.S. at 89**. The purported interest "must be a ... neutral one." ***Id.* at 90**. This neutrality requirement means that the regulation must be unbiased and even-handed in its operation. ***See id*. ("We have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression."); *see also Young*, 922 F.2d at 376 (upholding challenged prison policy, in part, because it "operate[d] with neutrality toward the content of religious expression")**. As the Seventh Circuit has stated: "[a] prison may not, because it is contemptuous or unreasoningly fearful of a particular sect, place arbitrary obstacles in the way of inmates seeking to participate in the sect's mode of observance." ***Johnson-Bey v. Lane*, 863 F.2d 1308, 1310 (7th Cir. 1988)**. Under the ***Turner*** framework, "a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." ***Turner*, 482 U.S. at 89-90**.

17.   Under the second ***Turner*** factor, the Court is to assess whether there were "alternative means to exercising the right [at issue] that remained open to [the] prison inmate[]." ***Turner*, 482 U.S. at 90**. The third ***Turner*** factor is an evaluation of the degree of impact the accommodation of the inmate's right would have on prison guards, other inmates, and prison resources. The fourth ***Turner*** factor focuses on whether "ready alternatives" to the challenged regulation exist. ***Turner*, 482 U.S. at 90**.

18.   Defendants have also failed to meet their burden of proof with respect to

Shatner's claims under RLUIPA and IRFRA. RLUIPA provides, in part, that the government may not impose "a substantial burden on the religious exercise of a person residing in or confined in an institution" unless the government demonstrates that burden furthers "a compelling governmental interest" and does so by "the least restrictive means." **42 U.S.C. § 2000cc-1(a)(1)(2)**. Similarly, IRFRA dictates that the government may not "substantially burden a person's exercise of religion" unless the government demonstrates that the burden furthers "a compelling governmental interest" and does so by "the least restrictive means." **775 ILCS 35/15**.

### iii. Defendants Benefield, Westerman, Pierce And Gilbert Deprived Shatner Of The Sacred Tarot Without Any Legitimate Penological Interest

19.     Shatner's Sacred Tarot is critical to his ability to practice the tenets of the Church of Light. It is the core body of the Church of Light's knowledge. The equivalent of the Scared Tarot in other religions is the Bible for Christians and the Koran for Muslims. Shatner explained that the Sacred Tarot is the foundation of his belief system. Without access to the Sacred Tarot, Shatner's ability to practice the Church of Light's tenets would be greatly limited.

20.     Shatner repeatedly explained to Defendants the importance of the Sacred Tarot to his religious beliefs. Despite knowing the importance of Shatner's Sacred Tarot to his religious practices, Defendants Benefield, Westerman, Pierce and Gilbert confiscated Shatner's Sacred Tarot on at least three occasions. In March 2000, Defendants Benefield, Westerman, Pierce, and Gilbert confiscated his Sacred Tarot. In July 2000, Defendant Benefield confiscated Shatner's Sacred Tarot. In September 2000, Defendants Pierce and Gilbert confiscated Shatner's Sacred Tarot. Defendants have provided no justification for these three confiscations to warrant impinging on Shatner's First Amendment rights.

21.     Applying the first **Turner** factor, Defendants' decision to confiscate Shatner's Sacred Tarot was not rationally related to any legitimate governmental interest and was not neutral. Defendants repeatedly attempted to justify their actions by claiming they were unsure whether the IDOC's Publication Review Committee had approved the Sacred Tarot on a content basis. But not a single Defendant testified they ever consulted the IDOC's supposed Approved List or the Adult Banned List or the Adult Disapproved List to confirm whether the Sacred Tarot was on any of these lists. Instead, Defendants simply decided on an ad hoc basis to confiscate the book. None of the Defendants even attempted to confirm whether or not the Sacred Tarot was

sent to the Publication Review Committee for review since they confiscated it based on its content. Indeed, if Defendants had consulted the Adult Banned List or the Adult Disapproved List, Defendants would have discovered that the Sacred Tarot is not listed on either.

22.     Moreover, Shatner testified that he received the Sacred Tarot through the mail. When books enter an IDOC facility through the mail, the mailroom is responsible for reviewing the book and sending questionable publications to the Publication Review Committee before giving the book to the inmate. As Shatner had the Sacred Tarot in his possession at one point, the Sacred Tarot had been screened and reviewed as a book that Shatner was entitled to have. Thus, there was no justification for Defendants to confiscate the Sacred Tarot based on content.

23.     In a last-ditch effort to salvage their justification that the content of the Sacred Tarot warranted its confiscation, Defendant Gilbert stated he believed Shatner's use of the Tarot cards and the related Sacred Tarot would allow him to possibly control or influence other inmates. Yet, the Court quickly quashed any such justification by asking for factual examples of what Shatner was doing to possibly have undue influence over the other inmates. The best answer Defendant Gilbert could give was that the inmates would "talk[] amongst each other and they would always look to [Shatner] as being the leader of this little clique...." The Court challenged these speculative justifications, asking whether, if an inmate who had a Bible became "too much of a leader" among the inmates, and if they were all "spouting Bible verses," he would take the Bible away. Defendant Gilbert said he would not confiscate the Bible. Defendant Gilbert's remarks demonstrate that Defendants operated in a non-neutral fashion by differentiating between "mainstream" religions and less well-known religions. ***Turner*, 482 U.S. at 90**.

24.     Further, Defendants attempt to justify their confiscation of the Sacred Tarot by claiming Shatner was over the IDOC limit for the number of books an inmate may have. This justification is patently wrong. First, there is no mention in the disciplinary ticket regarding the September 2000 confiscation of the Sacred Tarot that it was confiscated because Shatner had too many books. With respect to that confiscation, Lt. Gilbert testified that he took it simply because he thought Shatner should not have the book - and for no other reason. Second, Shatner also testified that he was willing to trade the Sacred Tarot for those books Defendants chose to leave in his property box, but Defendants refused, even though Defendants allowed other inmates to choose which books to keep when they had too many. Defendants refusal to allow Shatner to choose which books to keep demonstrates that they targeted Shatner. Defendants have not explained how their decision to confiscate

Shatner's religious books and not his non-religious books was neutral.  ***See Grossbaum v. Indianapolis-Marion County Bldg. Auth.*, 100 F.3d 1287, 1295 (7th Cir. 1996)("No matter how constitutionally sound a given rule may be, the repeated misapplication or selective application of the rule could create an entirely unconstitutional policy."); *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439 (1985)(establishing that "all persons similarly situated should be treated alike" by the government); *Powell v. United States*, 945 F.2d 374, 378 (11th Cir. 1991)("The Establishment Clause of the First Amendment prohibits denominational preferences, including those created by discriminatory or selective application of a facially neutral statute against a particular denomination.")**.

25. Accordingly, Defendants have failed to establish a legitimate and neutral penological interest in light of the fact that they disregarded the Publication Review Committee's lists and processes and they disregarded the custom and practice of allowing inmates to choose which books to keep when they had too many.  This ***Turner*** factor is dispositive of the issue of whether Defendants were justified in depriving Shatner of his religious freedom under the First Amendment's Free Exercise Clause.  Regardless, the Court will address the remaining factors.

26. Under the second ***Turner*** factors, Shatner's right to practice his religion was impaired.  The Sacred Tarot is critical to his ability to practice the tenets of the Church of Light, similar to Christians' importance in the Bible.  Therefore, the second ***Turner*** factor favors finding that Defendants' confiscations of the Sacred Tarot were not reasonably related to a legitimate penological interest.

27. Similarly, the third ***Turner*** factor also demonstrates that Defendants' confiscation of the Sacred Tarot was not legitimately related to a penological interest.  Defendants have not demonstrated any impact accommodating Shatner to have his Sacred Tarot would have on other inmates, guards and the prison's resources.

28. Finally, the fourth ***Tuner*** factor also favors finding Defendants had no legitimate penological interest in confiscating Shatner's Sacred Tarot.  All Defendants had to do was apply IDOC policies in a neutral, non-arbitrary manner.  Instead, Defendants choose to single Shatner out, and needlessly confiscate his Sacred Tarot.

### iv. Confiscation Of The Tarot Cards Without Any Legitimate Penological Interest

29. Shatner's religious Tarot cards are critical to his ability to practice the tenets of the Church of Light. The Church of Light is a religion based in the Tarot, such that without Tarot cards a Church of Light member's ability to practice the tenets of the faith is greatly hindered. The Tarot cards are similar to Christianity's use of icons. Shatner stated that he used the Tarot cards daily to practice his religion.

30. Applying the first **Turner** factor, Defendants Frentzel, Pierce, Cowan and Benefield's decisions to confiscate his Tarot cards on July 30, September 12 and September 30, 2000, were not rationally related to any legitimate governmental interest and was not neutral. Defendants admit that they knew that Shatner's Tarot cards were for religious purposes. Despite this, Defendants attempt to justify their decisions to confiscate Shatner's religious Tarot cards by speculating that the Tarot cards could possibly be used to control or influence other prisoners. However, Defendants must present specific evidence of how using the Tarot cards is a threat to institutional security in order to justify confiscation of the religious item. **See Goodman v. Carter, 2001 WL 755137, at \*6 (N.D. 2001)(Lindberg, J.)(because defendants cited only potential security concerns and failed to explain how plaintiff's access to Tarot cards specifically posed a threat to prison security, defendants did not demonstrate a legitimate penological interest in denying the inmate access to the Tarot cards). See also Shimer v. Washington, 100 F.3d 506, 510 (7th Cir. 1996)(refusing to accept a prison's conclusion that its policies furthered the State's interests without any supporting evidence).** There is absolutely no evidence indicating that Shatner ever used or attempted to use his Tarot cards for any purpose other than divination and mediation, and there is nothing inherently harmful about using Tarot cards for such purposes. **See Goodman v. Carter, 2001 WL 755137, at 10.**

31. The evidence establishes the legitimacy of Shatner's use of Tarot cards. Shatner testified that he never used the Tarot cards to try to manipulate another person because to "misuse the Tarot or astrology ... would be the ultimate sin in [his] eyes." Additionally, Mr. Gibson testified that the use of Tarot cards to control or cause harm to others is not condoned by the Church of Light, as the Church does not believe in doing anything to harm, manipulate or control another individual. Moreover, several Defendants testified that they had no concerns regarding prisoners using Tarot cards, and Defendant Pierce even testified that he did not think Tarot cards were contraband.

32. In fact, the only Defendant to even offer conjecture as to a "purported" concern about Shatner using Tarot cards was Defendant Gilbert. When asked by the Court for factual examples of what Shatner was doing to possibly have undue influence over other inmates, the best Defendant Gilbert could answer with was that inmates would "talk[] amongst each other and they would always look to [Shatner] as being the leader of this little clique...." The Court challenged these speculative justifications, asking if an inmate who had a Bible became "too much of a leader" among the inmates, and they were all "spouting Bible verses" would he take the Bible away, and Defendant Gilbert said that he would not confiscate the Bible. Defendant Gilbert's remarks demonstrate that Defendants differentiated between whether or not items should be confiscated based on whether they were affiliated with a "mainstream" religion versus a less well-known religion, so that they operated in a non-neutral fashion when impinging on Shatner's religious freedoms. ***Turner*, 482 U.S. at 90**.

33. Additionally, Defendants' refusal to allow Shatner access to his Tarot cards because of a supposed threat to security is difficult to understand when several Defendants, including Defendant Gilbert testified that inmates at Menard have been allowed to use Tarot cards. If Tarot cards were such a threat to security, one would expect that no inmate would be allowed to use Tarot cards.

34. Further, inmates are allowed under prison regulations to have playing and pinochle cards. Defendants did not offer any explanation as to why inmates were allowed playing and pinochle cards, but not Tarot cards, when there is no substantial difference. In fact, playing cards are derived from Tarot cards. That inmates are allowed to use playing and pinochle cards cuts against any argument that there is a rational relationship between Defendants' refusal to allow Shatner access to his religious Tarot cards and the related Sacred Tarot, and Defendants' purported penological interest. ***Goodman v. Snyder*, 2003 WL 715650, at \*4 (N.D. Ill. 2003)(Lindberg, J.)**.

35. Accordingly, the absence of any rational relationship between Defendants' confiscations of Shatner's Tarot cards and a legitimate and neutral governmental interest is dispositive on the issue of whether Defendants were justified in depriving Shatner of his religious freedoms under the First Amendment. Defendants were not justified. Regardless, the Court addresses the remaining ***Turner*** factors.

36. Defendants also have not established the second ***Turner*** factor in that no reasonable alternative was provided to Shatner so as to be able to practice his

religion. ***See Turner***, **482 U.S. at 90**. Defendants repeatedly confiscated the Tarot cards, a necessary tool to a practicing member of the Church of Light. Simply confiscating the Tarot cards and not allowing Shatner some access to them left him without any meaningful way to practice his religion.

37.     Likewise, Defendants have not established the third ***Turner*** factor by demonstrating any impact "the accommodation of the asserted constitutional right" would have on prison guards, other inmates and prison resources. ***Id***. Defendants only speculate as to the potential threat Tarot cards and the Sacred Tarot might have to prison security, which is insufficient to justify the confiscations.

38.     Finally, the last ***Turner*** factor also demonstrates that Defendants' repeated confiscations of Shatner's Tarot cards and the Sacred Tarot were unjustified, as complete prohibition on Shatner's use of Tarot cards and access to the Sacred Tarot was unnecessary. Prisons have allowed the use of religious items that may present a security concern, such as "herb burning," by allowing those items to be used only in restricted areas. ***See Auleta v. Goord***, **2007 WL 2471728, at \*7 (N.D. N.Y. 2007)(McAvoy, J.)**. Defendants cannot justify their total deprivation of access to the Tarot cards and the Sacred Tarot. They could have allowed Shatner to use his Tarot cards and Sacred Tarot only in his cell. ***See Young***, **922 F.2d at 376 (upheld challenged policy of allowing Jewish inmates to wear yarmulkes only when inside their cells during religious services under the *Turner* analysis, emphasizing that plaintiffs were not entirely prevented from wearing yarmulkes)**. Defendants also could have escorted Shatner to a designated, restricted area to use his Tarot cards, the same way they escort prisoners to attend religious services. ***See Goodman v. Snyder***, **2003 WL 715650, at \*4**. Such accommodations were made for another inmate in the IDOC who was allowed to use Tarot cards by himself in the visitors room.

39.     An application of the ***Turner*** factors demonstrates that Defendants Frentzel, Pierce, Cowan and Benefield were not justified in depriving Shatner of his religious freedoms under the First Amendment's Free Exercise Clause.

40.     Similarly, under RLUIPA and IRFRA, Defendants' decision to deny Shatner access to his religious Tarot cards lack a rational relationship to a legitimate and neutral government interest. Therefore, it follows that the burden imposed on Shatner's religious exercise does not further a compelling governmental interest.

**v. Defendants Benefield, Westerman, Pierce, And Gilbert Deprived Shatner Of His Religious Books Without Any Legitimate Penological Interest**

41.     Shatner's religious books are important to his religious beliefs and to his practice of the teachings of the Church of Light and the Rosicrucian Fellowship. Shatner explained at trial, that reading and studying are integral to his religious practices. Shatner needs his religious books to learn the lessons of the Church of Light and the Rosicrucian Fellowship.

42.     Moreover, Shatner's religious books are important to helping him seek guidance from charts. Shatner explained that he seeks guidance by constructing astrological charts. He needs his religious books to interpret these astrological charts.

43.     Despite knowing the importance of Shatner's religious books to his religious practices, Defendants Benefield, Westerman, Pierce, and Gilbert confiscated Shatner's religious books on at least three occasions. In March 2000, Defendants Benefield, Westerman, Pierce and Gilbert confiscated Shatner's religious books. In July 2000, Defendant Benefield confiscated Shatner's religious books. In September 2000, Defendant Pierce confiscated Shatner's religious books.

44.     Applying the first *Turner* factor, Defendants' decision to confiscate Shatner's religious books was not rationally related to any legitimate governmental interest and was not neutral. Defendants have not explained how their decision to confiscate Shatner's religious books and not his non-religious books was neutral. Thus, Defendants have not met their burden to establish legitimate and neutral governmental interest.

45.     Defendants' actual confiscation of Shatner's religious books was not rationally related to a legitimate governmental interest. Defendants testified that when they determined that an inmate had too many books, Defendants' custom and practice was to permit the inmate to choose which books to send out and which books to keep. Defendants applied this custom and practice to other inmates. However, Defendants refused to apply this custom and practice to Shatner. Instead, Defendants targeted Shatner, confiscated his religious books, and failed to provide him with an opportunity to select which books to keep and which books to send out.

46.     Moreover, even after the initial confiscations, Shatner repeatedly requested an opportunity to exchange non-confiscated, non-religious books for his confiscated religious books. His grievances following the March and July

2000 book confiscations specifically asked for an opportunity to exchange some of his non-religious books for his religious books. Defendants never provided him with this opportunity and never explained why they did not permit Shatner to exchange non-religious books for religious books. Defendants' decision to target Shatner's religious books and refusal to permit Shatner to retrieve his religious books in exchange for his non-religious books constitutes a selective enforcement in violation of the Equal Protection Clause. **City of Cleburne, 473 U.S. at 439(establishing that "all persons similarly situated should be treated alike" by the government); Grossbaum, 100 F.3d at 1295 ("No matter how constitutionally sound a given rule may be, the repeated misapplication or selective application of the rule could create an entirely unconstitutional policy."); Powell, 945 F.2d at 378 ("The Establishment Clause of the First Amendment prohibits denominational preferences, including those created by discriminatory or selective application of a facially neutral statute against a particular denomination.").**

47.    Thus, the absence of a rational relationship for Defendants' refusal to permit Shatner to choose which books to send out establishes the lack of a legitimate and neutral governmental interest. This factor is dispositive on the issue of whether Defendants were justified in depriving Shatner of his religious freedom under the First Amendment's Free Exercise Clause. However, even if Defendants were able to establish a rational relationship, the regulation at issue would still be constitutionally infirm in light of the remaining **Turner** factors.

48.    Under the second **Turner** factor, Shatner's right to practice his religion was impaired. Shatner's religious books were important to his religious practice, and without his religious books, Shatner's religious practices were impaired. Thus, the second **Turner** factor favors finding that Defendants' confiscations of Shatner's books were not reasonably related to a legitimate penological interest.

49.    The third **Tuner** factor similarly demonstrates that Defendants' confiscation of Shatner's religious books was not legitimately related to a penological interest. This factor focuses on the impact an accommodation would have had on other inmates, guards, and the prison's resources. Shatner is not seeking accommodations. He is simply asking that the Defendants apply the IDOC policies in a neutral and non-arbitrary way and that he receive the same opportunities as other inmates.

50.    Finally, the fourth **Turner** factor also favors in finding no legitimate

penological interest. Defendants had an obvious easy alternative to their practice - they could have applied the IDOC policies in a neutral fashion. Instead, Defendants applied the policies in an arbitrary and non-neutral fashion to single out Shatner.

### vi. Defendants Cowan, Oliver, And Frentzel Deprived Shatner Of His Right To Have A Medallion Without Any Legitimate Penological Interest

51. Shatner's religious medallion in the form of a pentagram is important to his religious beliefs and to his practice of the teachings of the Church of Light and the Rosicrucians. As Shatner explained at trial, the pentagram is important for helping Shatner pray. Shatner relies on the pentagram to protect him from evil or harmful spirits during prayer. Moreover, Mr. Edwall of the Rosicrucian Fellowship informed Defendants that the "the 5 point star is a significant symbol of our beliefs."

52. Despite knowing the importance of Shatner's pentagram medallion to his religious practices, Defendants Cowan, Oliver, and Frentzel denied Shatner the right to have his religious medallion. Specifically, Superintendent Frentzel asked Mr. Edwall of the Rosicrucian Fellowship whether the pentagram was a requirement of the Rosicrucian Faith. Based on this information, Superintendent Frentzel and Warden Oliver denied Shatner's right to have his pentagram medallion. Warden Cowan affirmed this decision and explained that Shatner was not permitted to have the medallion because: "the Representative stated that it is not a mandatory requirement for one to wear this emblem, it is completely up to the individual. Then in another correspondence, the same Representative stated that it is a significant part of their symbol and legitimate expression of the faith beliefs. Therefore, we denied his request."

53. As a matter of law, Shatner is only required to show that his pentagram medallion represents his religious beliefs and not that is *necessary or* required to her religious beliefs. ***Singh v. Goord*, 520 F.Supp 2d 487, 504 (S.D. N.Y. 2007)(Robinson, J.)("Although plaintiff testified that wearing a Khanda is not a requirement of the Sikh faith, Rothstein Decl. Ex. 56 at 80, the court recognizes the importance that religious pendants may serve in expressing and reminding adherents of their faith. Thus, to the extent that DOCS forbids plaintiff from wearing a Khanda, this would be a substantial burden on plaintiff's religious exercise.");** *Goodman v. Carter***, 2001 WL 755137, at *13 ("It is also true that one can be a Christian without a Bible, or a Muslim without a Koran, but no one would suggest**

that Christian or Muslim prisoners be denied their holy books); 20 Ill. Admin. Code 425.90 ("Committed persons shall be permitted to have up to two traditionally religious symbols which have been authorized by the Religious Practice Advisory Board and which represent their designated faith."). In requiring Shatner to prove that the pentagram medallion was necessary, Defendants applied the wrong legal standard.

54. Applying the first *Turner* factor, Defendants' decision to deny Shatner his religious medallion certainly was not neutral. Defendants arbitrarily imposed on Shatner's practice of his religion by applying the wrong legal standard and denying him his religious medallion. As explained above, Defendants denied the medallion because it was not required by Shatner's religion. This reason is not legally sufficient to deny Shatner his medallion.

55. After this litigation started, Defendants recognized that this reason was not legally sufficient and attempted to justify their decision with a new reason. Namely, Defendants claimed that the medallion posed a security threat because five-pointed stars are used to identify gangs. This new justification is simply a pretext, which was created after this litigation started. Indeed, none of the Defendants' documents indicate that Shatner was denied his medallion because of gangs, and Shatner was never told that his medallion was denied due to concerns about gangs. If this was the reason that Defendants denied his request, there would have been no need for Superintendent Frentzel to investigate whether a medallion was "required" to practice Shatner's religious beliefs and deny him the medallion on that basis. Moreover, the only evidence of a security concern are the Defendants' conclusory statements at trial. Conclusory statements are not sufficient for purposes of establishing a relationship between the regulation and constitutional deprivation at issue. *See Selma v. Snyder*, **2006 WL 1465558, at * 11 (S.D. Ill. 2006)(Gilbert, J.)("A conclusory statement that safety and security are at stake is not enough.")**. While, "the court must defer to [D]efendants' expertise in the types of security threats that could be posed by gang members in IDOC facilities," deference is not appropriate when there is no evidence that such expertise was, in fact, utilized. *See id.*

56. Additionally, Defendants' gang justification is not warranted. Even after 2006, IDOC's policy permitted inmates to have five-pointed stars. Consistent with this policy, inmates at Stateville, another IDOC facility, had religious medallions with five- and six-pointed stars. The inmates were only required to get rid of the medallions if the star in the medallion was not part of a larger composition. "A religious item which is not star-shaped but has a five-or six-point star or stars on it as a part of a larger composition, such as a medallion

with a crescent moon and a small star in its curve or a medallion of a saint with a halo of stars is still permissible. Shatner's medallion contained a five-pointed star as part of a larger composition including a circle. Thus, Shatner's medallion complied with the policy and should have been permitted.

57. Finally, Defendants have not applied their gang rationale in a neutral manner and have not prohibited other religious symbols, which are also game identifiers. **_See Goodman v. Snyder_, 2003 WL 715650, at \*4 ("[C]rucifixes and Christian crosses are objects and symbols that are also commonly used by gangs, but images of crosses are not banned in IDOC facilities.")**. Indeed, the IDOC permits crucifixes and Christian crosses throughout its facilities, including at Menard, and these crucifixes and Christian crosses can be used as gang symbols. **_Id_**. Thus, Defendants are treating crucifixes and Christian crosses differently from the pentagram medallion even though both arguably can be used as gang symbols. Nothing in the record indicates that Defendants have even attempted to justify this difference in treatment.

58. Thus, the absence of a rational relationship between Defendants' refusal to grant Shatner's request for access to his religious medallion and a legitimate and neutral governmental interest is dispositive on the issue of whether Defendants were justified in depriving Shatner of his religious freedom under the First Amendment's Free Exercise Clause.

59. Under RLUIPA and IRFRA, Defendants' decision to deny Shatner access to his religious medallion lacks a rational relationship to a legitimate and neutral governmental interest. Therefore, it follows that the burden imposed on Shatner's religious exercise does not further a compelling governmental interest.

## C. Damages

60. "[A] prisoner is entitled to judicial relief for a violation of his First Amendment rights aside from any physical, mental or emotional injury he may have sustained." **_Rowe_, 196 F.3d at 781-82**.

61. The Prison Litigation Reform Act "§ 1997e(e), as the plain language of the statute would suggest, limits recovery 'for mental and emotional injury,' but leaves unaffected claims _for nominal and punitive damages_, which seek to remedy a different kind of injury." **_Calhoun v. DeTella_, 319 F.3d 936, 941 (7th Cir. 2003(emphasis added); _Canell v. Lightener_, 143 F.3d 1210, 1213 (9th Cir. 1998)("[T]he deprivation of First Amendment rights**

entitles a plaintiff to judicial relief wholly aside from any physical injury he can show, or any mental or emotional injury he may have incurred. Therefore, § 1997e(e) does not apply to First Amendment [c]laims regardless of the form of relief sought."); *Reischauer v. Jones*, 2007 WL 1521578, at *9 (W.D. Mich. 2007)(Quist, J.)("The undersigned notes that if Defendants' reasoning were adopted, it would effectively eliminate all First Amendment claims for damages by prisoners. The same reasoning applies to claims under the RLUIPA"); *Percival v. Rowley*, 2005 WL 2572034, at *2 (W.D. Mich. 2005)(Endlen, S.J.)("This Court is convinced that allowing prison officials to violate the First Amendment rights with impunity, resolute in the knowledge that a First Amendment physical injury will virtually never manifest itself within the meaning of §1997e(e), is not what Congress intended when it passed the Act."). The Seventh Circuit's decision in *Calhoun* has not been overruled. *Calhoun* accurately explains the availability of damages under the Prison Litigation Reform Act.

62.     "Punitive damages are awarded to punish and deter reprehensible conduct... Because punitive damages are designed to punish and deter wrongdoers for deprivations of constitutional rights, they are not compensation "for" emotional and mental injury." *Calhoun*, 319 F.3d at 942; *see also Robinson v. United States*, 80 F. App'x 494, 498 (7th Cir. 2003)(asserting that *Calhoun* held that § 1997e(e) permits nominal and punitive damages); *Moss v. Westerman*, 04-cv-0570-MJR, 2008 U.S. Dist. LEXIS 1481, at *10 (S.D. Ill. 2008)(Reagan, J.)(relying on *Calhoun* for the proposition that the Seventh Circuit has held nominal damages available for constitutional injuries); *Thomas v. Sullivan*, 02-cv-0920-WDS, 2005 U.S. Dist. LEXIS 17229, at *7 (S.D. Ill. 2005)(Stiehl, J.)(citing *Calhoun* for the proposition that nominal and punitive damages are available for constitutional violations); *Agrawal v. Briley*, 02 C 6807, 2006 U.S. Dist. LEXIS 88697, at *48-49 (N.D. Ill 2006)(Pallmeyer, J.)("In the § 1983 context, the Seventh Circuit has held that where a plaintiff alleges a deprivation of a constitutional right, that deprivation is itself a cognizable injury; thus § 1997e(e) 'leaves unaffected the claims for nominal and punitive damages' arising from the constitutional violation."); *Perez v. Frank*, 06-C-248-C, 2007 U.S. Dist. LEXIS 27441, at *47-48 (W.D. Wis. 2007)(Crabb, J.)(finding that in a free exercise case, § 1997e(e) did not impact the availability of punitive damages for constitutional violations); *Meyer v. Teslik*, 411 F.Supp.2d 983, 991 (W.D. Wis. 2006)(Crabb, J.)(same); *Al Ghashiyah v. Wis. Dep't of Corr.*, 01-C-10, 2006 U.S. Dist. LEXIS 74835, at *37 (E.D. Wis. 2006)(Adelman, J.)("'Because punitive damages are designed to punish and deter wrongdoers for deprivations of

constitutional rights, they are not compensation 'for' emotional and mental injury.'"); *Rogers v. Hellenbrand*, 03-C-230-C, 2004 U.S. Dist. LEXIS 3610, at *12 (W.D. Wis. 2004)(Crabb, J.)(citing *Calhoun* for the proposition that plaintiff can recover nominal and punitive damages for First Amendment violations).

63. Punitive damages may be awarded when "defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983); *Alexander v. Milwaukee*, 474 F.3d 437, 453 (7th Cir. 2007).

64. It is clear that Lt. Westerman purposefully opened and read Shatner's legal mail, in violation of his constitutional rights. Such conduct warrants an award of punitive damages. Shatner was fully dependent on IDOC staff to ensure his legal communications were delivered to the U.S. Postal Service for mailing. Lt. Westerman received four years of training on prison mail policies and could review the policies or ask questions of a supervisor at any time. He knew Shatner's legal mail envelope contained a letter to his attorney, but despite this knowledge, he recklessly opened it and began to review its contents. When Lt. Westerman saw his name appear in the body of one of the letters, he went beyond "scanning" the contents and began to read the letter in detail. He then gave Shatner a disciplinary ticket based on the content of that letter - a privileged letter that he was unauthorized to read. These actions reflect Lt. Westerman's callous indifference to Shatner's constitutional rights, thus entitling Shatner to punitive damages for this claim.

65. Defendants Benefield, Westerman, Pierce and Gilbert acted intentionally and with evil intent in confiscating Shatner's Sacred Tarot. These Defendants referred to the Sacred Tarot as a "devil" book. They purportedly confiscated the Sacred Tarot because of its content, but never made any effort to determine whether the Publication Review Committee had reviewed the book or ensured that book was in fact reviewed. Defendants also claimed that Shatner's Sacred Tarot was confiscated because it could possibly be used to influence or control other prisoners, but admitted that they would not confiscate the Bible from an inmate they believed was citing Bible verses to other prisoners so as to influence or control them, thereby arbitrarily and discriminately applying their practices and policies.

66. Defendants Benefield, Westerman, Pierce and Gilbert also purportedly confiscated Shatner's Sacred Tarot because he had too many books without giving him the choice of which books to confiscate. Thus, these Defendants

intentionally created excuses to justify their actions.

67. Moreover, in confiscating Shatner's Sacred Tarot, Defendants Benefield, Westerman, Pierce and Gilbert deliberately choose to confiscate only his religious books and not his non-religious books. They would not allow Shatner an opportunity to trade his non-religious books for his religious books. Defendants Benefield, Westerman, Pierce, and Gilbert acted with an evil intent and a disregard of Shatner's religious beliefs.

68. Defendants Benefield, Gilbert, and Pierce acted intentionally and with evil intent in confiscating Shatner's Tarot cards. They called the Tarot cards "devil worship" materials. They confiscated the Tarot cards even though Shatner told them they were needed to practice his religion and they admitted to knowing as much. These statements and actions evidence the Defendants' blatant indifference to Shatner's constitutional right to practice his religion.

69. Defendants Benefield, Westerman, Pierce and Gilbert acted intentionally and with evil intent in confiscating Shatner's religious books. These Defendants referred to Shatner's books as "devil books." These Defendants confiscated Shatner's religious books because he purportedly had too many - but they failed to provide him with an opportunity to select which books to send out even though they provided this opportunity to other inmates. Thus, these Defendants deliberately went out of their way in an attempt to justify removing Shatner's religious books.

70. Moreover, in confiscating Shatner's books, they deliberately chose to confiscate only his religious books and not his non-religious books. They also refused to provide Shatner with an opportunity to trade his non-religious books for his religious books. Defendants Benefield, Westerman, Pierce and Gilbert acted with an evil intent and a disregard of Shatner's religious books.

71. Defendants Cowan, Oliver and Frentzel acted intentionally and with evil intent in denying Shatner his religious pentagram medallion. They deliberately disregarded the law permitting Shatner to have religious symbols that are important to him. They also deliberately and intentionally disregarded IDOC policy permitting Shatner to have a five-point star as a religious medallion. Instead, they created a new requirement only for Shatner.

72. This new requirement that a religious medallion be necessary was not imposed on other inmates. Instead, it was only imposed on Shatner. Indeed, Defendants did not dispute that inmates (probably hundreds of inmates) wear crucifixes and Christian crosses and that these religious symbols are not required by any religious faith. Yet, Shatner could only have his religious

medallion if it was required by his religious faith. This intentional and deliberate creation of a new requirement inconsistent with the law and policy and the application of this new requirement solely to Shatner warrants punitive damages.

73.    As a result of Defendants' violations of Shatner's constitutional rights, Shatner has suffered damages. Defendants' violations of Shatner's constitutional rights were motivated by evil intent to punish a "devil worshipper," and Defendants were recklessly and callously indifferent to Shatner's protected rights.

74.    Shatner's compensatory damages are:

|   |   |   |
|---|---|---|
| a. | Loss of Tarot Cards | $40.00 |
| b. | Loss of the Sacred Tarot | $75.00 |
| c. | Loss of other religious books | $653.00 |

75.    Shatner also suffered nominal damages for the following constitutional violations:

|   |   |   |
|---|---|---|
| a. | Reading of his legal mail | $1.00 |
| b. | Depriving him of his religious medallion | $1.00 |

76.    After a thorough review of the case law regarding punitive damages in Section 1983 First Amendment cases, the Court finds generally that the case law does not support an award of substantial amount of punitive damages in cases such as this with minimal compensatory damages. ***See Moss v. Westerman*, 04-cv-0570-MJR (Docs. 115 & 118) (Jury awarded $1.00 for nominal damages and $0 for punitive damages based on a Section 1983 First Amendment retaliation claim wherein Plaintiff suffered no physical injury); *Watkins v. Kasper*, 560 F.Supp.2d 691 (N.D. Ind. 2008)(Springmann, J.)(Jury awarded $150.00 in compensatory damages and $1,000.00 in punitive damages based on a Section 1983 First Amendment retaliation claim); *Lam v. Shaffer*, 94-0042-CJP (Jury awarded $1.00 in compensatory damages and $1,000.00 in punitive damages based on First Amendment claim); *Henderson v. Johnson*, 2007 WL 781767 (C.D. Ill. 2007)(Baker, J.)(Jury awarded $300,000.00 in compensatory damages and $18,500.00 in punitive damages on First Amendment retaliation claim. However, district court reduced the compensatory damages to $1.00 and punitive damages to $500.00).** Based on the case law and the facts of this case, the Court finds that Shatner is entitled to the following punitive damages:

|   |   |   |
|---|---|---|
| a. | Reading of his legal mail | $500.00 |

| b. | Loss of Sacred Tarot book | $100.00 |
| c. | Loss of Tarot cards | $100.00 |
| d. | Loss of other religious books | $200.00 |
| e. | Depriving him of his religious medallion | $100.00 |

The Court's rationale for the varying amounts is that the total amount comes within the range of the typical case without physical injury of zero to one thousand dollars. The aggregate of the punitive damages for the deprivation of the religious materials is $500.00. The punitive damages established by the Court for the deprivation of his right of confidence between he and his lawyer is $500. It is difficult to weigh one right more heavily than another, it would seem that, even to cynical correctional officers, violating the institution's policies on something so obvious as attorney client privilege should carry a heavier burden and punishment. So even though the deprivation of the legal right represents just one act versus many and repeated acts over a long period of time, the seriousness and more obviousness nature of the deprivation seems to warrant the heavier burden.

## IV. Conclusion

Accordingly, the Court **FINDS** in favor of Darrin Shatner and against Defendants Thomas Page, Roger Cowan, Ian Oliver, Alan Frentzel, William Pierce, Darryl Westerman, David Dobbs, Keith Benefield, Robert Gales, and Lamont Gilbert on Shatner's religion claims - Count 2 and the Court **FINDS** in favor of Darrin Shatner and against Dennis Stewart and Darryl Westerman on Shatner's legal mail claim - Count 6. Further, the Court finds that Shatner is entitled to compensatory damages for his books in the amount of $768.00; that Shatner is entitled to nominal damages in the amount of $1.00 on his legal mail claim and nominal damages in the amount of $1.00 for depriving him of his religious medallion and that Shatner is entitled to punitive damages in the amount of $1,000.00 as set forth above for a total of $1,770.00. The Court **ORDERS** the Clerk of the Court to enter judgment reflecting the same. Lastly, the Court **DENIES as moot** Defendants' motions to strike (Docs. 164 and 171).

**IT IS SO ORDERED.**

Signed this 4th day of February, 2009.

/s/ David R Herndon

**Chief Judge**
**United States District Court**